IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID N. WASHINGTON,  *

   Plaintiff  *

       v  *  Civil Action No. DKC-15-3181

TIMOTHY STEWART, *et al.*,  *

   Defendants  *

        ***

**MEMORANDUM OPINION**

Pending is a motion to dismiss, or alternatively, for summary judgment filed by Defendants Timothy Stewart, Mohamed Moubarek, and Kristi Crites. ECF No. 22.[1] Plaintiff has responded. ECF No. 28. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, Defendants' dispositive motion will be GRANTED.

**I. Complaint Allegations**

Plaintiff David N. Washington, an inmate currently confined at the Federal Medical Center-Devens in Ayer, Massachusetts, filed his complaint naming as Defendants the Warden of Federal Correctional Institution ("FCI") Cumberland, Timothy Stewart, FCI Cumberland Clinical Director Mohammed Moubarek, and FCI-Cumberland Certified Registered Nurse Practitioner Kristi Crites. ECF No. 1, pp. 1-2. Plaintiff alleged that he was denied constitutionally adequate medical care while housed at FCI Cumberland. As a federal prisoner, Plaintiff asserts his civil rights claims pursuant to *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

---

[1] Citations are to the court's electronic docket, except as to ECF No. 22, Ex. 1 which is filed separately in paper format.

In support of his complaint, Plaintiff states that on September 9, 2013, he was transferred from the District of Columbia Jail to FCI Cumberland. *Id*, p. 3., ¶ 1. At the time of his transfer, Plaintiff brought with him his medical records and prescribed medications. *Id*. At that time, Plaintiff was prescribed medication to treat his severe lower back, right hip, right knee, and leg pain, as well as medication for prostate problems, high cholesterol, and severe depression. *Id*.

Plaintiff's medication was withheld from him during his arrival screening at FCI-Cumberland. He was advised that he would need to be seen by the doctor at the FCI before he would be authorized to resume taking the prescribed medication. *Id.*, ¶ 2. "Days later" Plaintiff was seen by Dr. Lin who advised Plaintiff that the Bureau of Prisons (BOP) would have to approve continuation of Plaintiff's prescribed medication. *Id*., ¶ 3. Plaintiff was advised that he would have to purchase Ibuprofen through the commissary for pain relief while he awaited approval from the BOP regarding as to his prescribed pain medication. *Id*.

After Dr. Lin left FCI-Cumberland, at the end of 2013, Plaintiff was assigned to Ms. Hennigan a/k/a Nurse Practitioner Kristi Crites. *Id*., ¶ 4. Plaintiff states that Crites never called Plaintiff for chronic care appointments or for any other reason. *Id*. Plaintiff complained to Mr. Shook, Health Services Administrator, regarding the failure to call him to the chronic care clinic, his medical issues not being addressed, and that he was required to pay $2.00 per visit when utilizing an emergency sick call. *Id*.

At an unspecified time, Plaintiff began to experience severe pain in his right hip, in both legs, and in his back. *Id*., p. 4, ¶ 5. Plaintiff experienced difficulty walking due to the pain and also due to hardness in his right calf. He reported to medical on an emergency sick call on May 21, 2014. *Id*. On that same day, Plaintiff was transported to an outside radiology clinic

where an ultra sound was performed. On May 23, 2014, he was transported to the West Virginia University Medical Center and seen in the Vascular Surgery Department. *Id*. Plaintiff was advised by the surgeon that the ultra sound images were inadequate and a CT scan was necessary to determine whether and what type of surgery was required. *Id*. The surgeon advised Plaintiff to have the CT scan done and return with the results as soon as possible. *Id*.

Mohamed Moubarek, Clinical Director at FCI-Cumberland, refused to authorize the CT scan and instead ordered Plaintiff to receive intravenous antibiotics for seven days; indicating his belief that Plaintiff suffered from an infection and not a blood clot. *Id*., ¶ 6. Plaintiff neiether returned to the West Virginia University Medical Center nor received the CT scan the surgeon requested. *Id*.

Plaintiff indicates that he sent several requests to health services complaining about the pain and numbness he experienced in both legs following the antibiotic treatment. *Id*., ¶ 7. Plaintiff indicates that he attempted to address his concerns with Crites. *Id*., p. 5, ¶ 8. Plaintiff alleges that Crites exhibited apathy and indifference towards his medical needs. *Id*. In support of his claim, Plaintiff states that he signed authorizations for Crites to request and receive his medical records from outside providers so she could understand his various medical needs. Crites did not receive the relevant medical records and when Plaintiff advised her that the obtained records were incomplete and not relevant to his current concerns she advised him to obtain the records himself. *Id*.

Plaintiff filed grievances regarding his medical care and contacted Congresswoman Eleanor Holmes Norton regarding his complaints. *Id*., ¶¶ 9 & 10. In response to the Congresswoman's inquiry, Warden Timothy Stewart advised that, pursuant to the representations

of Mohamed Moubarek, Plaintiff was receiving treatment and medication for his conditions and was being considered for an orthopedic evaluation in regard to his hip complaints. *Id*., ¶ 10. In response to Stewart's representations, Plaintiff advised Stewart that he was not being treated for any of his medical conditions and had not been prescribed any medications. *Id*., p. 6, ¶ 11.

On an unspecified date, Plaintiff advised the Health Services Administrator that he was experiencing severe pain and numbness in both of his legs and it was difficult to walk short distances due to the loss of feeling. Crites was unable to determine that anything was wrong with Plaintiff's legs and did not refer him to a specialist for further examination. *Id*., ¶ 12. Plaintiff was advised by the Health Service Administrator that he would not assign Plaintiff a new care provider as medical care and treatment were within the purview of Moubarek. *Id.*, ¶ 13.

On January 30, 2015, Plaintiff informed Assistant Warden Arviza that he was suffering severe pain and numbness in both his legs making it difficult to walk short distances. *Id*., ¶ 14. Arviza contacted Dr. S. McGann, who was on duty at that time. Plaintiff was seen by Dr. McGann that day and prescribed medications to treat the pain in his hip and legs and medication for high cholesterol. Plaintiff was diagnosed as suffering from diabetes and prescribed diabetic medication. Dr. McGann also referred Plaintiff for high blood pressure checks but Plaintiff states those were not performed by Crites. *Id*.

Plaintiff alleges that Moubarek advised him that the BOP did not provide medical care for non-life threatening medical conditions and Plaintiff would have to endure without surgery. *Id*., p. 7, ¶ 15.

4

A request for orthopedic evaluation of Plaintiff's right hip had been submitted by Moubarek to the Mid-Atlantic Region on January 29, 2015. *Id*., ¶ 16. The request was approved and notice provided to Plaintiff on February 12, 2015. *Id*.

On March 26, 2015, Plaintiff was taken to the West Virginia University Orthopedic Clinic and evaluated by Dr. Karim Boukhemis who determined that Plaintiff was in need of a hip replacement. *Id*., ¶ 17. It was noted that Plaintiff suffered from arthritis in the hip and was unable to perform his daily activities and was in constant pain. *Id*. Plaintiff indicates that determination regarding Plaintiff's vascular problems in his legs was necessary prior to any surgery. *Id*.

Plaintiff returned to FCI-Cumberland where he continued to experience severe pain in his right hip, pain and numbness in both legs, and the toe on his left foot swelled and curled. *Id*., ¶18. Plaintiff was advised by Crites and Moubarek that there was nothing unusual about his foot and it did not appear he suffered from a vascular condition. Moubarek continued to refuse authorization of the CT scan requested by the vascular surgeon in May of 2014. *Id*.

On May 12, 2015, a Health Services Administrator submitted a "Re-Designation Referral Request for Medical Transfer" to Warden Stewart which was approved. *Id*., p, 8, ¶ 19. The matter was then submitted to Moubarek who referred the matter to the Mid-Atlantic Region Medical Designator Cheryl Owens who recommended that the request be submitted for "Regional review via Inter-Qual" to determine whether Plaintiff's condition met established criteria for hip replacement. *Id*. On June 23, 2015, Dr. Gomez disapproved the request for hip replacement. *Id*.

5

Plaintiff was advised by Moubarek that he would have to undergo physical therapy before authorization for medical transfer and hip replacement would be approved. *Id*., ¶ 20. Plaintiff began physical therapy in July of 2015. He was advised by the physical therapist that after four sessions he would be re-evaluated. *Id*. Plaintiff states that he continues to have severe pain in his hip, pain and numbness in both legs, and difficulty walking and sleeping. *Id*.

Moubarek advised Plaintiff that the pain and numbness in his legs was probably related to the arthritis in his hip. Moubarek continued to disregard the request for a CT scan. *Id*., ¶21.

Plaintiff indicates that Crites failed to identify any of Plaintiff's medical issues. *Id*., p. 9, ¶ 23. He notes that Dr. McGann diagnosed Plaintiff as suffering from diabetes, high blood pressure, high cholesterol, and prescribed medication after one evaluation and review of his medical records. *Id*., p. 8, ¶ 22. Plaintiff states that he continues to suffer pain and numbness in both his legs. *Id*., p., 9, ¶ 24. He alleges that Moubarek has no evidence to support his inference that Plaintiff's medical issues are due to his arthritic hip as opposed to a vascular issue. *Id*. Plaintiff further alleges that Crites and Moubarek have conspired to omit documentation of Plaintiff's symptoms. *Id*., ¶ 25.

### Defendants' Response

Defendants assert that Plaintiff received appropriate medical care and provide medical records to support their assertion. ECF No. 22, Ex. 1. Upon Plaintiff's intake at FCI-Cumberland on September 9, 2013, it was noted that he suffered from back, hip, knee and leg pain and would be evaluated by the primary care provider. *Id*., p. 17. The following medications were renewed or ordered: Ibuprofen, Gemfibrozil (used to reduce cholesterol and triglycerides)[2],

---

[2]   *See* https://www.drugs.com/gemfibrozil.html.

Trazodone (used to treat depression)[3], Pravastatin (a "statin" used to reduce "bad" cholesterol),[4] Tamsulosin, (an alpha-blocker used to relax the muscles in the prostate and bladder)[5], and Gabapentin[6] (an anti-epileptic medication used to treat seizures as well as certain types of pain). *Id.*, p. 18.

**A.     Right Hip Pain**

Upon Plaintiff's intake at FCI-Cumberland, Plaintiff complained of right hip pain. *Id.*, Ex. 1, pp. 15-36. Dr. Lin ordered an x-ray which revealed moderate degenerative joint disease. *Id.*, p. 35. Plaintiff was advised that he could purchase over the counter pain medication via the commissary. *Id.*, p. 37. During Plaintiff's examination on September 18, 2013, he was able to sit on the examination table with his right hip fully flexed without "gross discomfort." *Id.*, p. 31.

On September 9, 2014, during Plaintiff's routine care clinic visit, he advised Crites that he was suffering chronic hip pain after playing handball. *Id.*, p. 174. Crites ordered an x-ray and referred Plaintiff to the commissary for over the counter pain medication. *Id.*, pp. 173-178; *see also* ECF No. 22-5, ¶ 4 (Crites Declaration). The x-ray showed moderate degenerative joint disease (ECF No. 22, Ex. 1, p. 291) which was no change from the x-ray taken in September of 2013. ECF No. 22-5, ¶ 5.

Another hip x-ray was conducted in January of 2015; this time revealing severe degenerative joint disease in the right hip. ECF No. 22, Ex. 1, p. 282. On January 22, 2015, Crites evaluated Plaintiff during a follow up appointment. *Id.*, p. 144; ECF No. 22-5 ¶ 7. She and Moubarek reviewed the x-ray and diagnosed Plaintiff as suffering from severe degenerative

---

[3]     *See* https://www.drugs.com/trazodone.html.
[4]     *See* https://www.drugs.com/pravastatin.html.
[5]     *See* https://www.drugs.com/tamsulosin.html.
[6]     *See* https://www.drugs.com/gabapentin.html.

joint disease in the right hip. ECF No. 22, Ex. 1, pp. 146, 148. Crites requested a consultation with an orthopedic surgeon. *Id*., p. 144.

Moubarek and Crites opine that Plaintiff's engagement in strenuous physical activity in late 2014 likely accelerated his joint disease. ECF No. 22-5 ¶ 18, ECF No. 22-6 ¶ 18 (Moubarek Declaration). Medical records demonstrate that Plaintiff was treated on a number of occasions for injuries arising from playing handball in late 2014. ECF No. 22, Ex. 1, pp. 53, 153, 161, 163.

Plaintiff complained on January 30, 2015, that he suffered hip pain on a daily basis. *Id*,. p. 128. Examination demonstrated a decreased range of motion. *Id*., p. 130. Dr. McGann prescribed Meloxicam for pain relief. *Id*. On February 3, 2015, Moubarek requested referral of Plaintiff to an orthopedic surgeon for evaluation which was approved on February 12, 2015. *Id*., p. 126 & 272.

Plaintiff was evaluated by an orthopedic surgeon on March 26, 2015. The surgeon found Plaintiff's symptoms and x-rays demonstrated severe arthritis of the right hip. Given the amount of arthritis present, a total hip replacement was recommended. *Id*., p. 262. Plaintiff was scheduled for a follow up with his primary care physician in two weeks to discuss the results of the consultation. *Id*., p. 119.

Thereafter, Moubarek and Crites began the process to have Plaintiff transferred to a higher-level care facility so he could undergo a total hip replacement. ECF No. 22-5, ¶ 10; ECF No. 22-6, ¶ 10; ECF No. 22, Ex 1, pp. 592-595. Ultimately, the acting Regional Medical Director denied the request to transfer for a total hip replacement on the basis that less invasive measures, in this case physical therapy, should first be explored. ECF No. 22-5, ¶ 1; ECF No. 22-6, ¶ 11; ECF No. 22, Ex 1, p. 597.

Crites wrote a consult for Plaintiff to begin physical therapy. ECF No. 22-5, ¶ 12. Plaintiff participated in four physical therapy sessions from late August 2015 to September 2015. ECF No. 22, Ex. 1, pp. 602-606. In October, 2015, the physical therapist noted minimal improvement over the course of the four visits. *Id*,. p. 608. The physical therapist indicated Plaintiff's pain was not muscular in nature and he would have poor rehabilitation potential. The physical therapist sent a "close out note" to FCI Cumberland on October 5, 2015. *Id*.

On October 16, 2015, Crites sent a second request for Plaintiff to undergo a right hip placement. *Id*., p. 611; ECF No. 22-5, ¶ 13. The request noted that Plaintiff had been provided bottom bunk status, a cane for assistance in walking, Tylenol, Motrin and Mobic provided no pain relief to Plaintiff, he did not benefit from physical therapy, and that an outside orthopedic surgeon recommended a total hip replacement. ECF No. 22, Ex, 1, p. 611; ECF No. 22-5, ¶ 13. Plaintiff was approved for a transfer to a Care 4 level institution in December of 2015. ECF No. 22, Ex. 1, p. 624.

On March 14, 2016, Plaintiff was transferred to Federal Medical Center (FMC) Devens where he was awaiting surgery at the time Defendants' filed their dispositive motion. ECF No. 22-5, ¶ 17; ECF No. 22-6, ¶ 17; ECF No. 22-7, ¶ 5 (Yeh Declaration).

**B.     Arterial Disease**

Although Plaintiff self-reported he suffered from vascular disease, Plaintiff's medical providers never diagnosed him with same and there is no objective evidence he suffers from same. ECF No. 22-5, ¶ 20, ECF No. 22-6, ¶ 19 ECF No. 22, Ex. 1, pp., 182, 219, 260, 262, 317.

On May 21, 2014, Plaintiff reported pain in his right calf. ECF No. 22, Ex. 1, pp. 215-221; ECF No. 22-6, ¶ 21. He was sent out for a sonogram that same day to rule out Deep Vein

9

Thrombosis ("DVT"). *Id*. The sonogram ruled out DVT but a 6 centimeter ill-defined mixed echogenic area in the right calf muscle consistent with a post traumatic hematoma or possible infection was identified. ECF No. 22, Ex 1, p. 345, 539; ECF No. 22-6, ¶ 21. After reviewing the ultrasound report Moubarek decided to treat Plaintiff for a possible infection by administering antibiotics. ECF No. 22, Ex. 1, p. 439; ECF No. 22-6 ¶ 21. On May 27, 2014, it was noted that the hematoma was resolving and there was no need for further antibiotics. ECF No. 22, Ex. 1, p. 411. Plaintiff was scheduled for follow-up on June 30, 2014, regarding this issue but failed to appear. *Id*., p. 179, ECF No. 22-6, ¶ 22. Examination of plaintiff during a routine chronic case clinic in September of 2014, showed that his lower extremities were within normal limits. ECF No. 22, Ex. 1, p. 404; ECF No. 22-6 ¶ 23.

**C.     Left Toe Deformity**

Plaintiff complained of foot pain and numbness on several occasions. *Id*., Ex. 1, p. 149, 377, 619. In January, 2015, an x-ray of Plaintiff's left foot was ordered. *Id*., p. 508. The x-ray showed no fractures but demonstrated that Plaintiff was flat footed and had a minor bunion. (hallux valgus with 14 degrees). *Id*. On January 30, 2015, a monofilament examination of Plaintiff's left foot was conducted which revealed a loss of sensation. *Id*., p. 130. Dr. McGann noted that the neuropathy could be due to diabetes and prescribed Metformin. *Id*. Records demonstrate that thereafter Crites, as well as other providers, counseled Plaintiff on a number of occasions regarding his need to maintain a healthy diet, exercise, and monitor his weight due to his diabetic condition. *Id*., pp. 51, 146, 350, 355, 374, 624; ECF No. 22-5 ¶ 7, 21. Moreover, Plaintiff was prescribed medication to help control his diabetes. ECF No. 22, Ex. 1, p. 624.

## II. Non-dispositive Motions

### A. Motions to Seal

Pending is Defendants' Motion to Seal. ECF No. 21. Local Rule 105.11 governs the sealing of all documents filed in the record and states in relevant part that: "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." Local Rule 105.11 (D. Md. 2016). The rule balances the public's general right to inspect and copy judicial records and documents, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, *see In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The common-law presumptive right of access can only be rebutted by showing that "countervailing interests heavily outweigh the public interest in access." *Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014) (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). The right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Id.* at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)). "[S]ensitive medical or personal identification information may be sealed," although not where "the scope of [the] request is too broad." *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011). Having shown a compelling interest in sealing Plaintiff's medical records at issue, the Motion to Seal shall be granted.

### III. Standard of Review

**A.     Motion to Dismiss**

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**B.     Motion for Summary Judgment**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have

the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

### IV. Analysis

A.     **Official Capacity**

Plaintiff's claims against Defendants in their official capacities are subject to dismissal. A *Bivens* action will not lie against federal agencies or federal officials in their official capacity. *See FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994).

B.     **Absolute Immunity**

Crites, an employee of the United States Public Health Services ("PHS") (ECF 22, Ex. 4, ¶ 2), is entitled to absolute immunity as to Plaintiff's *Bivens* claim. Plaintiff's sole remedy for Crites' alleged conduct is through the Federal Tort Claims Act (FTCA).

Title 42 U.S.C. § 233(a) provides:

> The remedy against the United States provided by [the FTCA]...for damage for personal injury, including death, resulting from the performance of medical, surgical, dental or related functions...by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding....

In *Hui v. Castaneda*, 559 U.S. 799 (2010), the Supreme Court held that § 233(a) precludes *Bivens* action against PHS personnel for constitutional violations arising out of their official duties. *Id*., 802. "Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Id*. at 806. The

plain text of § 233(a) precludes a *Bivens* action. *Id*. at 811. As such, Crites is entitled to dismissal.

C. **Supervisory Liability**

It is well established that the doctrine of respondeat superior does not apply in claims of this type. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Nonmedical correctional supervisors are entitled to rely on the medical judgments and expertise of prison medical staff as to the appropriate course of treatment for inmates. *See Shakka v. Smith*, 71 F. 3d 162, 167 (4th Cir. 1996); *see also Miltier v. Beorn*, 896 F. 2d 848, 854-55 (4th Cir. 1990) (holding supervisory prison officials entitled to rely on the professional judgement of trained medical providers and may only be found deliberately indifferent through intentional interference in the inmate's medical care).

Plaintiff's claim that Warden Stewart failed to insure that he was provided "the requisite standard of care by the Health Services Department" (ECF No. 1, p. 11) is insufficient. Warden Stewart is not personally responsible for the medical screening, diagnosis or treatment of inmates and defers to the opinions and medical expertise of the professionals within the Health Services.

ECF No. 22, Ex. 7, ¶ 3. Plaintiff has failed to point to any personal conduct by Warden Stewart in regard to the provision of medical care to Plaintiff.

**D.     Eighth Amendment**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

### Analysis of Eighth Amendment Claim

The undisputed record establishes that Plaintiff did not suffer a serious medical need for which he did not receive constitutionally adequate medical care. Indeed, the records filed establish that Crites and Moubarek, along with other medical staff, have treated Plaintiff's complaints and filed the appropriate requests for consultation with outside specialists.

As to Plaintiff's hip pain, he was provided analgesic medication as well as several x-rays. When x-rays demonstrated a worsening of his degenerative joint disease he was referred to an outside specialist who recommended hip replacement. Plaintiff takes issue with the rapidity with which his joint disease progressed from moderate to severe, and cites same as evidence of

Defendants' indifference. ECF No. 28. Plaintiff's care providers at FCI-Cumberland promptly instituted the paperwork to authorize the surgery and have Plaintiff transferred to the appropriate facility. The request was rejected in favor of additional conservative treatment. Thereafter, Plaintiff was provided physical therapy which ultimately proved ineffective. His medical providers again filed paperwork to have his surgery approved and him transferred. This second request was approved. "D]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). No exceptional circumstances are demonstrated here.

As to Plaintiff's claim of vascular disease, there is simply no evidence in the record that Plaintiff suffered from vascular disease while housed at FCI-Cumberland. When Plaintiff complained of pain in his calf he was sent immediately for diagnostic testing. The testing ruled out DVT but was suspicious for either a bruise or infection. Dr. Moubarek prescribed antibiotics to treat the possible infection and Plaintiff was seen for follow up care which revealed that the issue had resolved. While Plaintiff maintains that the issue had not resolved in that his leg remained painful, Plaintiff was advised by Moubarek that he believed the pain Plaintiff suffered in his legs was not caused by vascular disease but rather was caused by Plaintiff's degenerative joint disease.

Plaintiff notes that on May 18, 2016, he was taken to the University of Massachusetts Medical Center where an on-site ultra sound was performed which revealed "the same condition that existed on 5-21-14 while at Cumberland, FCI." ECF No. 28, p. 5. Plaintiff does not explain what this "condition" is, nor does he provide a copy of any medical report. The fact that some two years later Plaintiff suffered the same or similar ailment does not demonstrate that Moubarek

callously disregarded a threat to Plaintiff's health. Despite Plaintiff's contention that Moubarek acted with deliberate indifference, there is simply no evidence to support such a claim. Moubarek assessed Plaintiff and decided on a conservative course of treatment which appeared to be effective. To the extent Moubarek erred in assessing Plaintiff's ailment, at best the record would support a claim of negligence, not deliberate indifference.

Plaintiff's complaint regarding his toe was also investigated via evaluation and diagnostic procedures which included x-rays and nerve testing. Plaintiff suffered no fracture in his toe but did suffer from a bunion and neuropathy which medical staff believed was related to his diabetes. As a result of the diagnostic testing, Plaintiff was prescribed Metformin to better control his diabetes.

The fact that Plaintiff's concerns have been documented, discussed, followed-up, and referred for testing, is evidence that there has been no attempt by medical staff or the named Defendants to ignore a serious medical need or recklessly to disregard it.

While it is understandable that Plaintiff may have desired more aggressive treatment, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977) (emphasis in original). The record evidence indicates that Plaintiff's requests were considered and his needs addressed. To the extent some of Plaintiff's complaints may have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Plaintiff's bald allegations of denial of medical care amount to little more than a disagreement with the judgment of his health care providers. Such

disagreement with a course of treatment does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975). Defendants are entitled to summary judgment in their favor.[7]

### V. Conclusion

For the aforementioned reasons, Defendants Motion to Dismiss, or in the Alternative Motion for Summary Judgment, construed as a Motion for Summary Judgment, shall be granted. A separate Order follows.

February 10, 2017 _____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[7] Having found no constitutional violation, the court need not address Defendants' claims that they are entitled to qualified immunity.